NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

KEN AQUILINO o/b/o PATRICIA A.
AQUILINO, Deceased,

                    **Plaintiff,**

v.                                                          Case No. 6:15-CV-393-Orl-28KRS

COMMISSIONER OF SOCIAL
SECURITY,

                    **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the Complaint filed by Plaintiff Ken Aquilino on behalf of his deceased wife, Patricia A. Aquilino. Mr. Aquilino seeks review of the final decision of the Commissioner of Social Security denying his wife's claim for social security benefits. Doc. No. 1. An answer, Doc. No. 13, the certified copy of the record before the Social Security Administration ("SSA"), Doc. No. 15, and the parties' Joint Memorandum, Doc. No. 19, have been filed.[1]

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 16. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order. *Id.* at 4.

NOT FOR PUBLICATION

## **PROCEDURAL HISTORY.**

In 2011, Mrs. Aquilino filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*. She alleged that she became disabled on March 5, 2009. R. 216, 223.

After her applications were denied originally and on reconsideration, Mrs. Aquilino asked for a hearing before an Administrative Law Judge ("ALJ"). R. 168. An ALJ held a hearing on June 11, 2013. Mrs. Aquilino, accompanied by an attorney, Mr. Aquilino and a vocational expert ("VE") testified at the hearing. R. 33-66.

After considering the hearing testimony and the evidence in the record, the ALJ issued a decision on July 19, 2013. R. 17-25. The ALJ found that Mrs. Aquilino was insured under OASDI through December 31, 2014. R. 18. The ALJ concluded that Mrs. Aquilino had not engaged in substantial gainful activity since the alleged disability onset date. R. 19.

The ALJ found that Mrs. Aquilino had degenerative disc disease, an adjustment disorder and polysubstance abuse, which were severe impairments. *Id.* The ALJ concluded that Mrs. Aquilino did not have an impairment or combination of impairments that met or equaled an impairment listed in the SSA regulations. *Id*.

The ALJ concluded that Mrs. Aquilino had the residual functional capacity ("RFC") to perform light work, as follows:

> The claimant can lift twenty pounds occasionally and ten pounds frequently. The claimant can sit for six hours and stand for six hours in an eight-hour workday. The claimant can only occasionally climb stairs, kneel, stoop, crouch, balance and crawl.

> The claimant is limited to simple, routine tasks with only an occasional change in routine work setting.

R. 21. In reaching this conclusion, the ALJ gave great weight to the assessment of Homi Cooper, M.D., an examining physician. R. 23. The ALJ did not give significant weight to the opinions of Todd B. Jaffe, M.D., a treating physician, finding them to be "internally inconsistent and manifestly inaccurate." R. 23. The ALJ also found Mrs. Aquilino's subjective reports of her limitations to be not completely credible. R. 21.

The ALJ determined that Mrs. Aquilino could not perform any of her past relevant work. R. 24. Based on the testimony of the VE, the ALJ concluded that Mrs. Aquilino could perform light, unskilled work available in the national economy, specifically mail sorter, operator and clerk. R. 24-25. Therefore, the ALJ concluded that Mrs. Aquilino was not disabled. R. 25.

Mrs. Aquilino requested review of the ALJ's decision by the Appeals Council. R. 11. On January 9, 2015, the Appeals Council found no basis for changing the ALJ's decision. R. 1-3.

Mrs. Aquilino died on August 30, 2014. Doc. No. 1, at 2. Her spouse now seeks review of the final decision of the Commissioner by this Court.[2] Counsel for Plaintiff asks that the Court reverse the final decision of the Commissioner and remand the case for further proceedings. Doc. No. 19, at 37.

## JURISDICTION AND STANDARD OF REVIEW.

Mrs. Aquilino having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to

---

[2] Federal regulations provide that the surviving spouse of an OASDI claimant and of an SSI claimant may receive benefits payable to the deceased claimant. 20 C.F.R. §§ 404.503(b)(1), 416.542 (b)(1).

determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Mrs. Aquilino's privacy to the extent possible.

Mrs. Aquilino was born in 1961. R. 216. She graduated from high school and obtained an Associate's Degree. R. 492. She previously worked as an accounting clerk, manager in a telemarketing business, and office manager. R. 61-62.

At the ALJ's hearing, Mrs. Aquilino complained of neuropathy with lack of feeling from her knees to her toes and in her hands and some fingers starting in April 2011. R. 40-41, 50. Mrs. Aquilino experienced neck pain beginning in 1993. R. 42. She also had back pain following a laminectomy in August 2000. R. 46. On a good day, she could lie down and watch television and sometimes stand up long enough to make a cold sandwich. R. 43-44. On a bad day, her joints ached and she did not feel well. R. 45-46.

During the hearing, Mrs. Aquilino apologized for constantly changing position in her chair. R. 47. Mrs. Aquilino estimated that she needed to move positions every fifteen to twenty minutes. R. 47. She always used a walker. She indicated that three weeks earlier she fell five days in a row. She had a hard time going up and down steps. R. 48-50. Medication caused her to be

sleepy and she had memory loss. R. 53-54. Mr. Aquilino testified that he had to assist his wife in getting dressed. R. 57-58.

Medical records show that Dr. Jaffe at Brevard Pain Management treated Mrs. Aquilino for radiating back pain since at least 2008. R. 361-62, 414-66. Dr. Jaffe's diagnoses included post-laminectomy syndrome lumbar L3-4, L4-5 and L5-S1, with lumbar and cervical pain. R. 460. Dr. Jaffe treated Mrs. Aquilino with narcotic pain medication, including a morphine pain pump, Lyrica and other medications. *See, e.g.*, R. 458, 460. In and before June 2011, Dr. Jaffe recommended that Mrs. Aquilino perform home exercise and stretching as tolerated. *E.g.*, R. 435, 438, 447, 451, 460.

On September 16, 2011, Mrs. Aquilino told Dr. Jaffe that she had lumbar pain of fluctuating intensity. She indicated that medication helped her to accomplish activities of daily living, and that side effects of the medication were not bothersome or were manageable. R. 411. Dr. Jaffe prescribed methadone among other medication. *Id.*

Mrs. Aquilino was hospitalized in November 2011 due to complaints of back pain after a fall. The treatment note reflects that she had a morphine pump implanted about three years earlier but that she was not currently using it. She was taking methadone. She was treated with medication and discharged with a recommendation by physical therapy for a frontend rolling walker. She was to follow a course of physical therapy. R. 469, 470. She was also treated with Xanax for anxiety. R. 472.

Mrs. Aquilino returned to Dr. Jaffe after discharge. She complained of increased lower back pain, which fluctuated in intensity, resulting in decreased activity tolerance. However, with her medication she could perform activities of daily living. Side effects of her medication were

not bothersome and were manageable. R. 487. Dr. Jaffe's diagnoses included lumbar post-laminectomy syndrome, lumbar radiculopathy and low back pain. He continued Mrs. Aquilino on long-term methadone therapy. R. 488.

On January 24, 2012, Mrs. Aquilino reported that Dr. Jaffe was no longer her physician and no doctor would accept her insurance. She admitted taking one or two methadone pills prescribed to her husband. She sought treatment at Circles of Care due to depression and anxiety after she stopped taking methadone. R. 498. The examiner's assessment was that Mrs. Aquilino had an adjustment disorder with mixed anxiety and a depressed mood and opioid dependence. R. 500.

From December 2011 through March 2012, Mrs. Aquilino sought treatment from Sohair L. Sedaros, M.D. R. 511-16. Various radiologic tests were performed. R. 517-18, 522-27, 531-36. On April 2, 2012, Mrs. Aquilino complained of neck pain. R. 578. The examiner observed muscle spasm and assessed degenerative disc problems at C5-7. R. 578. Weakness and shaking of the legs were noted on May 14, 2012. R. 581.

Dr. Jaffe examined Mrs. Aquilino again on March 8, 2012, after she changed her insurance. R. 53, 503-06. She complained of constant lumbar pain fluctuating in intensity and leg numbness. On March 16, 2012, Dr. Jaffe completed a treating source questionnaire. He reported that Mrs. Aquilino had decreased grip strength, a gait disturbance, chronic pain, radiculopathy and limited range of motion. He wrote, "Patient has had previous failed back surgery which has caused chronic pain as well as the above checked" symptoms. Dr. Jaffe indicated that Mrs. Aquilino needed a wheeled walker to assist with ambulation. R. 507-08.

On March 22, 2012, Mrs. Aquilino was again hospitalized for complaints of neck pain. She was treated with medication. A cervical CT scan showed mild spondylosis. R. 544.

Dr. Jaffe prepared a more detailed functional capacity medical source statement in May 2012. He wrote that he had treated Mrs. Aquilino over seventeen years. His diagnoses were lumbar post-laminectomy syndrome, low back pain, lumbar radiculopathy, neck pain and degenerative disc disease of the spine, among other findings. R. 559. Mrs. Aquilino's symptoms were multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, numbness and tingling, anxiety and depression. R. 559. Mrs. Aquilino's pain ranged from 4 on a 10-point pain scale to 9 on that scale with activity. Dr. Jaffe indicated that Mrs. Aquilino's pain required narcotic therapy. Factors that precipitated her pain were changing weather, fatigue, movement/overuse, cold, stress and static position. R. 560. He further indicated that Mrs. Aquilino had limited spinal range of motion, an abnormal gait, reflex loss, muscle spasm and weakness. She could not walk a city block without pain. She could sit five minutes at a time, stand or walk five minutes at a time and sit or walk less than two hours in an eight-hour day. She would need to be able to shift positions at will. R. 561-62. She could rarely lift less than ten pounds and never engage in postural activities. She required use of a wheeled, seated walker. R. 562.

On May 2, 2012, Donald Morford, M.D., prepared a physical functional capacity assessment after review of Mrs. Aquilino's records. He opined that Mrs. Aquilino could lift up to ten pounds. She could stand and/or walk two hours a day and sit about six hours a day. She could only occasionally climb ladders, ropes and scaffolds. She should avoid concentrated exposure to hazards. R. 103-05.

On May 3, 2012, Dr. Cooper examined Mrs. Aquilino at the request of the SSA. Mrs. Aquilino complained of neck pain with bilateral hand numbness and muscle spasms. She also suffered from radiating low back pain with numbness from her feet up to her thighs. She was taking methadone. R. 565. She could dress herself with difficulty. She could not perform household cleaning. She could care for her personal hygiene, read, eat, watch television and use a computer. R. 566. Upon examination, Dr. Cooper noted "considerable symptom magnification." R. 567. Mrs. Aquilino had mild tightness in the lumbosacral area. She had normal range of motion in the cervical and thoracic spine with some limitation in the lumbar area. R. 568. Full strength was noted in the upper and lower extremities. She could perform walking tests relatively well, without using her walker, albeit in "a non-organic fashion." R. 568-69. Dr. Cooper's assessment was that Mrs. Aquilino could stand and walk for five out of eight hours a day, sit for seven out of eight hours a day, lift and carry five to ten pounds frequently and up to fifteen to twenty pounds occasionally. She could bend, stoop, crouch, crawl and climb at least occasionally. A wheeled walker was not medically necessary. R. 569. She could reach, grasp, handle, feel and finger repetitively. R. 570.

Miguel Rivera, M.D., a neurologist, examined Mrs. Aquilino on June 22, 2012. Mrs. Aquilino complained of cold and numb feet and legs and constant numbing, tingling and prickling sensations in her legs, feet and fingers. She also reported neck and low back pain among other problems. R. 584. Upon examination, Dr. Rivera observed a discrete weakness of extension of her left lower extremity. Sensation was decreased peripherally in both lower extremities. Her back revealed a positive Yeoman's sign indicative of pain. After reviewing radiologic tests, Dr. Rivera opined that Mrs. Aquilino had peripheral neuropathy and post-laminectomy syndrome

among other impairments. Dr. Rivera requested further testing. R. 585. EMG and nerve condition studies were abnormal in the upper and lower extremities compatible with motor sensory polyneuropathy. R. 587. Dr. Rivera dispensed a seizure medication for neuropathy and encouraged Mrs. Aquilino to discuss her thyroid problems with her primary care physician. R. 588.

On July 6, 2012, Dr. Jaffe performed surgery and removed the morphine pump from Mrs. Aquilino. R. 643-44. Thereafter, Dr. Jaffe continued to treat Mrs. Aquilino with MS Contin. R. 647-48, 716-17.

On November 5, 2012, K. Terry, M.D., prepared a physical functional capacity assessment after review of Mrs. Aquilino's records. He opined that Mrs. Aquilino could lift up to ten pounds occasionally and less than ten pounds frequently. She could stand and/or walk at least two hours a day and sit about six hours a day. She could occasionally engage in postural activities but never climb ladders, ropes and scaffolds. She should avoid concentrated exposures to extreme cold, wetness and humidity, and she should avoid even moderate exposure to hazards. R. 131-35. Dr. Terry explained his assessment as follows:

> With an established [history] of pain, known back impairment and surgeries but limited exam [abnormal] the previous RFC limiting lifting to 10 lbs appears appropriate although adding alternating of stand to sit hourly for 5 min and further limiting hazards is warranted. The [claimant's] reported limits are out of proportion to the [objective medical records] but pain has been taken into consideration[.]

R. 131-38.

In December 2012, Dr. Jaffe performed a facet nerve rhizotomy on Mrs. Aquilino's lumbar spine that provided excellent relief from pain. R. 722-23. In January 2013, he performed the same procedure on the cervical spine. R. 721.

Mrs. Aquilino had a follow-up visit with Dr. Rivera on March 22, 2013. She reported that her chronic problems were getting gradually worse and that she was unable to obtain her prescribed medication due to financial and insurance problems. Upon examination, Dr. Rivera noted painful paresthesias in the lower extremities. R. 712.

On May 21, 2013, Dr. Jaffe prepared another medical source statement. In this assessment, he indicated that Mrs. Aquilino met the American College of Rheumatology criteria for fibromyalgia. R. 741. His assessment was consistent with his previous medical source statement in terms of her functional capacity. R. 741-45.

Mrs. Aquilino complained of painful neuropathy in her legs when she visited Dr. Sedaros on July 15, 2013. R. 943.

At the hearing, the ALJ asked the VE to assume a hypothetical person of Mrs. Aquilino's age, education and past work experience. The person could lift up to twenty pounds occasionally and ten pounds frequently. The person could stand and sit six hours each in an eight-hour workday. The person could occasionally climb stairs, stoop, balance, kneel, crouch and crawl. R. 62. The person could perform simple, routine tasks with occasional change in the routine work setting. R. 63. The VE testified that this hypothetical person could perform the light, unskilled jobs of mail sorter, collator operator and routing clerk. R. 63. The VE testified that the person could perform these jobs with a sit/stand option every thirty minutes with slight postural change. R. 64. If the person needed to hold on to a walker while standing, the VE testified that "she's going to have problems." R. 65.

Nᴏᴛ ғᴏʀ Pᴜʙʟɪᴄᴀᴛɪᴏɴ

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Mrs. Aquilino raises four assignments of error. She contends that the ALJ erred by not giving significant weight to the opinions of Dr. Jaffe, a treating physician. She also submits that Dr. Cooper's opinion, to which the ALJ gave great weight, conflicts with the ALJ's RFC assessment. She argues that the ALJ erred by rejecting the functional capacity assessments of Drs. Morford and Terry. Finally, she asserts that the ALJ erred in finding her report of limitations from pain and other subjective symptoms not to be completely credible. She requests that the Court reverse the decision and remand the case for further proceedings. I will address these assignments of error in turn.

*Opinions of Dr. Jaffe.*

Dr. Jaffe treated Mrs. Aquilino for eighteen years. R. 741. Therefore, he is a treating physician whose opinions are entitled to substantial weight. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). When, as here, an ALJ does not give significant weight to the opinion of a treating physician, R. 23, "[t]he ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

The ALJ did not mention Dr. Jaffe by name in the decision, but he did indicate that he did not give significant weight to the three opinions from Brevard Pain Management. R. 23. The ALJ cited to the examination by Dr. Cooper as inconsistent with the severe functional limitations in Dr. Jaffe's functional capacity assessments. This finding is supported by substantial evidence in the record. Upon examination, Dr. Cooper found normal range of motion in the cervical and thoracic spine with only mild tightness in the lumbosacral area. Mrs. Aquilino had full strength in

her upper and lower extremities. She was able to perform walking tests well without use of a walker.

Other reasons cited by the ALJ for not giving significant weight to Dr. Jaffe's opinions were that Dr. Jaffe had recommended that Mrs. Aquilino perform home exercises and stretching, Mrs. Aquilino was able to sit throughout the fifty-six minute hearing, and she changed positions during the hearing. There is record support for each of these findings. *E.g.*, R. 33, 47, 56, 66, 435.

Accordingly, I recommend that the Court find that the ALJ applied the correct legal standard to Dr. Jaffe's opinion. The ALJ articulated the reasons for not giving substantial weight to those opinions, which reasons are supported by substantial evidence in the record. Therefore, the first assignment of error is not well taken.

*Opinions of Dr. Cooper.*

The ALJ gave great weight to the opinion of Dr. Cooper, which he referred to as "[t]he better evidence." R. 23. Among other things, Dr. Cooper opined that Mrs. Aquilino could stand and walk for five hours a day. Counsel for Plaintiff contends that this finding undermines the ALJ's conclusion that Mrs. Aquilino could perform work at the light level of exertion because such work, by definition, requires standing and walking, off and on, for approximately six hours a day. Doc. No. 19, at 27 (citing SSR 83-10, 1983 WL 31251, at *6).

The ALJ did not explain why he concluded that Mrs. Aquilino could stand and walk six hours a day rather than five hours a day as stated by Dr. Cooper. Counsel for the Commissioner contends that this error was harmless because the testimony of the VE was sufficient to establish that Mrs. Aquilino could perform jobs the VE identified even if she could only stand and walk five

NOT FOR PUBLICATION

hours a day. *Id.* at 28 (citing *Torres v. Comm'r of Soc. Sec.*, No. 6:14-cv-783-Orl-KRS, Doc. No. 18, at 18 (M.D. Fla. Aug. 28, 2015)).

In *Torres*, an ALJ concluded that the claimant could stand/walk six hours a day, while the physician to whose opinion the ALJ gave great weight opined that the claimant could stand/walk four hours a day. *Torres*, No. 6:14-cv-783-Orl-KRS, Doc. No. 18, at 17-18. The ALJ did not explain why he did not adopt the physician's opinion. Nevertheless, I found the error to be harmless because a VE testified that the claimant could perform designated jobs with a sit/stand option that would permit the claimant to sit for thirty minutes following by standing for thirty minutes before returning to a seated position. Therefore, in an eight-hour workday, the claimant would only need to stand/walk for four hours in thirty-minute increments. *Id.* at 18.

The VE testimony in the present case is not the same as in *Torres*. In the present case, the VE testified that the jobs he identified could be performed with a sit/stand option every thirty minutes with a slight postural change. R. 64. The ALJ did not ask and the VE did not testify about the maximum period the person could stand or walk before changing positions. As noted above, light exertional work generally contemplates standing or walking for six hours a day. So, for example, if the person could stand/walk for thirty minutes, then sit for one minute before again standing/walking for another thirty minutes throughout a six-hour day, the person would be required to stand/walk more than five hours in the work day.[3] Thus, in the present case the testimony of the VE is insufficient to establish that the ALJ's failure to explain why he did not credit the five-hour

---

[3] Roughly calculated as follows: 12 30-minute intervals in a 6 hour day = 360 minutes a day (12 x 30) – 12 minutes seated after each 30-minute interval of standing = 348 minutes; 348 minutes of standing ÷ 60 minutes per hour = 5.8 hours of standing per 6-hour day.

13

stand/walk limitation identified by Dr. Cooper and include it in the RFC assessment was harmless error.

When an ALJ does not explain why he rejected elements of a physician's opinion, despite giving the opinion great weight, the record is insufficient to determine whether the ALJ's conclusions were rational and supported by substantial evidence. *Watkins v. Comm'r of Soc. Sec.*, 457 F. App'x 868, 871 (11th Cir. 2012) (per curiam). Because the ALJ's decision and the record as a whole are insufficient to determine whether there was work available that Mrs. Aquilino could have performed if she had been limited to standing or walking five hours per day, I recommend that the Court find that the second assignment of error is meritorious and that it requires reversal of the final decision of the Commissioner.

*Opinions of the Reviewing Physicians.*

Counsel for Plaintiff argues that the ALJ erred by failing to credit the functional capacity assessments prepared by Dr. Morford and Dr. Terry. The ALJ explained his decision by stating that the opinions of these reviewing physicians were inconsistent with the findings and opinion of Dr. Cooper. R. 23. Substantial evidence supports the ALJ's conclusion. Additionally, "[t]he opinion of a non-examining physician is . . . entitled to little weight when it contradicts the opinion of an examining physician." *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011) (per curiam) (citing *Lamb*, 847 F.2d at 703).[4]

For these reasons, I recommend that the Court find this assignment of error to be unavailing.

---

[4] Unpublished decisions of the Eleventh Circuit as cited as persuasive authority.

NOT FOR PUBLICATION

*Credibility.*

In the last assignment of error, counsel for Plaintiff contends that the ALJ did not articulate explicit and adequate reasons supported by substantial evidence in the record to support the conclusion that Mrs. Aquilino's reports of limitations arising from pain and other subjective symptoms were not entirely credible. *See Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (per curiam).

In this case, the ALJ articulated three reasons to support his credibility finding, as follows:

> First, the medical evidence in [the] record establishes fewer functional limitations than alleged . . . . Second, the claimant's prescribed course of treatment diverge[s] from the testimony at [the] hearing. Finally, the opinion evidence in [the] record establishes that the claimant's residual functional capacity is greater than that alleged.

R. 21. The first and third findings are supported by the opinion of Dr. Cooper.

It is, however, unclear what the ALJ found inconsistent between the prescribed course of treatment and the testimony at the hearing. Counsel for the Commissioner argues that the ALJ was relying on Mrs. Aquilino's statements recorded in medical records that she could perform activities of daily living with use of medication. Doc. No. 19, at 35-36. However, the ALJ contrasted the prescribed course of treatment with the testimony at the hearing, not statements in the medical records.

While the first and third reasons supporting the credibility finding may be sufficient to satisfy the requirement of *Foote*, if the Court accepts the recommendation to reverse the decision based on the error in the consideration of Dr. Cooper's opinion, discussed above, then I recommend that the Court require a more detailed articulation of the basis for a credibility decision on remand supported by specific citation to the record evidence relied upon to support that decision.

NOT FOR PUBLICATION

### RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** pursuant to sentence four of § 405(g) and that the case be **REMANDED** for further proceedings.  I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

### Notice.

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

**Respectfully Recommended** this 1st day of June 2016.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE